PATRICK MCDONOUGH (SBN 288285)
MATT O'MALLEY (SBN 272802)
San Diego Coastkeeper
3900 Cleveland Ave., Ste. 102
San Diego, CA 92103
Ph: 619-758-7743
Email: patrick@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
CHRIS C. POLYCHRON (SBN 230103)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> HANSON AGGREGATES PACIFIC SOUTHWEST, LLC, a California Corporation, <br><br> Defendant. | Civil Case No. **'22 CV0667 BAS WVG** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On March 10, 2022, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Hanson Aggregates Pacific Southwest, LLC ("Defendant") as owner and operator of the Facility located at 389 Hollister St., San Diego, California 92154 ("Hollister Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and

in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Hollister Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water from the Hollister Facility to downstream waters and groundwater including Otay River, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Hollister Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the

Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.    The polluted discharges from the Hollister Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

III.    **PARTIES**

14.    Hanson Aggregates Pacific Southwest, LLC is an active California corporation and is the Owner and/or Operator of the Facility.

15.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the Hollister Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in

interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.    California's IGP.**

29.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997

Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.    In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

34.    Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

35.    Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.    The IGP Discharge Prohibitions.**

36.    The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

37.    The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

38.    These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

39.    The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

40.    The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the

applicable receiving water quality objectives." Basin Plan at 4-20.

41.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.     The IGP Effluent Limitations.**

42.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

43.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

44.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

45.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

46.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa*

*Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

47.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

48.     The 2015 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .014 mg/L for copper; .082 mg/L for lead; .12 mg/L for zinc; and 1.0 mg/L for iron. 2015 MSGP Fact Sheet at 55−56.

49.     The 2021 MSGP freshwater EPA Benchmarks include but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0−9.0 s.u; .68 mg/L for N+N; .00519 mg/L for copper; .082 mg/L for lead; and .12 mg/L for zinc. 2021 MSGP Fact Sheet at 80−81.

**E.     The IGP Receiving Water Limitations.**

50.     The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

51.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

52.     The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

53.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

54.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants

for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

55.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

56.     The Beneficial Uses for the Otay River downstream from the Facility's include: non-contact water recreation; warm freshwater habitat; wildlife habitat; rare, threatened, or endangered species; and the potential beneficial use of contact recreation.. Basin Plan, Table 2-2.

57.     The Beneficial Uses for San Diego Bay include: contact recreation; non-contact water recreation; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; marine habitat; estuarine habitat; spawning, reproduction, and/or early development; shellfish harvesting; commercial and sport fishing; navigation; and industrial service supply. *Id*., Table 2-3.

58.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

59.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

60.     According to the 2016 303(d) List, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"). Specific segments of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

61.     According to the 2020/2022 303(d) List, which incorporates a much larger and more recent dataset, the Otay River is impaired for copper, zinc, toxicity, dissolved oxygen, phosphorus, benthic community effects, total dissolved solids, indicator bacteria,

pyrethroids, bifenthrin, and cyfluthrin.

62.     On January 19, 2022, the California State Water Resources Control Board adopted the 2020-2022 California Integrated Report (Clean Water Act Section 303(d) List and 305(b) Report), and submitted it to U.S. EPA for final approval on April 1, 2022.

63.     Polluted discharges from industrial facilities, such as the Hollister Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

64.     The following WQS are established by the Basin Plan for the Otay River: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

65.     The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

66.     Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.     The IGP Storm Water Pollution Prevention Plan Requirements.**

67.     Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

68.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

69.     The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential

pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

70.    Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

71.    The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

### G.    The IGP Monitoring and Reporting Requirements.

72.    Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

73.    The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water

discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

74.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

75.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

76.     The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

77.     Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

78.     Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

79.     Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

80.     Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

81.     Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

82.     Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable

requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

83.    All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

## V.    **FACTUAL BACKGROUND**

### A.    **Facility Site Information, Industrial Activities, and Pollutant Sources.**

84.    The SMARTS database indicates the Hollister Facility first obtained IGP coverage to conduct industrial operations on October 15, 1998, under Waste Discharge Identification Number 9 37I014665.

85.    The Facility encompasses 16.4 acres, approximately three percent of which are impervious, and all of which is used for industrial activities and exposed to precipitation and stormwater runoff. 2021 SWPPP § C.1.

86.    Both the 2021 SWPPP and 2020 NOI list the Facility's Standard Industrial Classification ("SIC") code as 3273 (Ready-Mixed Cement).

87.    Information available to Plaintiffs, including direct observations, photographs, and publicly available images, indicate that SIC codes 5032 (Brick, Stone, and Related Construction Materials) also applies to the Facility.

88.    According to the 2021 SWPPP, the "Facility receives recycled concrete and asphalt from customers and stockpiles the materials on site for processing." 2021 SWPPP § C.2. These materials are crushed, screened, and processed at the Facility, and then sold and shipped out. *Id*.

89.    Direct observations, photographs, and publicly available images indicate there are large, uncovered, outdoor stockpiles of concrete, asphalt, and other sand or aggregate materials at the Facility.

90.    Returning concrete trucks bring excess wet concrete to the Facility, where

this wet concrete is windrowed on a concrete pad near the stockpile area. When the concrete has dried it is stockpiled. *Id*. § F.1.

91.    The interiors of the concrete trucks are washed out, also on a concrete pad, and a loader is used to construct berms around the washing activities. When the concrete has dried it is stockpiled. *Id*. § F.7.

92.    Although Section C.2 of the 2021 SWPPP states that "[t]ruck maintenance and fueling is performed offsite," Section G of the same SWPPP states "[p]reventive maintenance on vehicles is performed onsite by a mobile mechanic." The SWPPP does not state where such maintenance activities occur at the Facility.

93.    Direct observations indicate that various vehicle and equipment maintenance activities are conducted at the Facility.

94.    Direct observations, along with the 2018 site map, indicate K rails are stored at the Facility.

95.    The 2021 SWPPP acknowledges the Facility's industrial processes with potential for storm water pollutant exposure include unloading and stockpiling of recycle concrete, drying concrete, truck washing activities, spills and leaks from trucks and equipment, dust stemming from concrete and asphalt crushing and screening operations, and wind-generated dust generated from the stockpiles. 2021 SWPPP §§ F.1–G.

96.    The SWPPP's BMP summary table acknowledges the Facility's sediment and particulate runoff are potential threats to storm water quality. For example, the BMP summary table explains that berms and grading "are used to the extent practicable to retain particulates onsite;" that stockpiles are "too large to cover" and thus a retention pond is used to control sediment run-off from the stockpile locations; that the stockpiles also generate dust which is deposited around the Facility; and that interior truck washing activities must be controlled by berms to prevent illicit discharges. *Id*. § G.

97.    Information available to Plaintiffs, including direct observations, indicates the following industrial processes at the Facility likely pose significant threats to the quality of the Facility's storm water discharges: outdoor stockpiling of used concrete,

broken asphalt, and other aggregates; outdoor storage of equipment, machinery, and other industrial materials; all loading, unloading, processing, crushing, screening, and shipping of industrial materials; and vehicle and equipment maintenance activities.

98.    On January 29, 2021, a Coastkeeper representative visually observed trackout of wet, ultra-fine particulates, running from the Facility's main point of ingress/egress along 27th Street all the way to the bridge, which crosses the Otay River. Evidence of ultra-fine particulates flowing off the access road via curb cuts, and toward the Otay River was also observed.

99.    On that same date, discharges of cloudy, opaque water through a berm along the northern boundary of the Facility was observed. The water was observed seeping through this berm, creating a pond of discharged water immediately to the north of the Facility, which then flowed toward the Otay River through a rill in a larger earthen berm located north of the Facility's boundary.

100.    This discharge location is not identified acknowledged by the Facility SWPPP or site map, and these discharges have not been acknowledged or sampled.

101.    Total suspended solids ("TSS"), oil and grease ("O&G"), pH, and iron are the minimum parameters required for SIC code 327X facilities.

102.    The EPA Industrial Stormwater Fact Sheet for Sector E industrial activities indicates that pollutants associated with the Facility's industrial activities and materials include TSS, pH, COD, lead, iron, zinc, biological oxygen demand ("BOD"), aluminum, arsenic, cadmium, chromium, benzene, and O&G.[1]

103.    Information available to Plaintiffs, including their experience engaging with facilities with similar industrial activities and industrial materials, indicates that the Facility has a high potential to discharge TDS, nitrogen, and phosphorus in its stormwater and non-stormwater discharges. *See* Exhibit 1, Similar facilities with phosphorus and

---

[1] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector E: Glass, clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities* (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_e_glass.pdf.

nitrogen discharges. Rebar embedded in concrete is frequently coated with phosphorus.

104.   According to the 2021 SWPPP, the 16.4 acre Facility is considered one drainage area and has one discharge point ("DP-1"), and "DP-1, located at the retention pond, receives all run-off from the facility," and will only discharge when the retention pond overflows. 2021 SWPPP § C.3.

105.   However, direct observations and photographs demonstrate the Facility has discharged opaque water from the northern boundary of the Facility, which thereafter flow into the Otay River. Therefore, the SWPPP and site map are inaccurate, the Facility is not one drainage area, and all runoff from the Facility does not flow to the retention pond near DP-1.

106.   Direct observations and photographs also establish that sediments and fine particulates are tracked off the site via the paved access road, which crosses the Otay River. During rainfalls, these sediments and particulates sheetflow off the access road via curb cuts, and flow toward the Otay River, and/or directly into the Otay River.

107.   The Otay River flows westward and discharges into the south end of San Diego Bay, and eventually the Pacific Ocean.

108.   Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Hollister Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

109.   Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

110.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles

and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

111.  Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

112.  Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

113.  Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

114.  Plaintiffs are informed, believe, and thereon allege that industrial activities at the Hollister Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

115.  Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

116.  Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

117.  Plaintiffs are informed, believe, and thereon allege that the Hollister Facility's polluted discharges have caused and/or contributed, and continue to cause

1   and/or contribute, to the impairment of water quality in Receiving Waters in violation of

2   the IGP.

3       118.   Plaintiffs are informed, believe, and thereon allege that elevated levels of

4   numerous pollutants have resulted in the inability of Receiving Waters to support their

5   Beneficial Uses.

6       119.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges

7   of polluted storm water and non-storm water from the Hollister Facility impact

8   Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by

9   degrading the quality of those waters, and by posing risks to human health and aquatic

10  life.

11       **B.   The Hollister Facility Discharges Contaminated Storm Water in**

12            **Violation of the IGP.**

13       120.   Plaintiffs are informed, believe, and thereon allege that with every

14  significant rain event, the Hollister Facility discharges polluted storm water via storm

15  drainage systems into the Receiving Waters.

16       121.   Plaintiffs are informed, believe, and thereon allege that the Receiving

17  Waters into which the Defendant discharges polluted storm water are waters of the

18  United States and therefore the IGP properly regulates discharges to those waters.

19       122.   Plaintiffs are informed, believe, and thereon allege that storm water and non-

20  storm water discharges from the Hollister Facility violate the Discharge Prohibitions,

21  Effluent Limitations, and Receiving Water Limitations of the IGP.

22       **1.  Discharges of Polluted Storm Water from the Hollister Facility**

23            **Violate IGP Discharge Prohibitions.**

24       123.   Plaintiffs are informed, believe, and thereon allege that the Hollister Facility

25  has discharged and continues to discharge numerous pollutants in concentrations that

26  cause or threaten to cause pollution, contamination, or nuisance in and around Receiving

27  Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

28       124.   The California Water Code defines "contamination" as "an impairment of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     18

the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

125.    "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

126.    Plaintiffs are informed, believe, and thereon allege the Facility has discharged and continues to discharge unauthorized NSWDs in violation of the IGP.

127.    The 2021 SWPPP acknowledges that spills and leaks of various industrial materials can occur at the Facility. While the SWPPP states that site grading "would retain most potential spills" onsite, "most" does not account for "all" spills, and the Permit explicitly prohibits all such NSWDs, and as such this grading BMP is inadequate. *See* 2021SWPPP § F.7.

128.    The SWPPP also acknowledges interior truck wash water as a potential NSWD, explaining that berms are constructed around the washing site to contain the wash water. *Id*. The Facility SWPPP and site map fail to provide any another information about the washout area such as its retention capacity, the constitution of the berms, where excess water flows, or how water is reclaimed.

129.    As cloudy, opaque water was observed discharging through a berm at the northern boundary of the Facility, Plaintiffs are informed, believe, and thereon allege that wash water escapes the truck washout areas, comingles with storm water through the rest of the Facility, and potentially discharges such from the northern boundary of the Facility.

130.    Direct observations also demonstrate that ultrafine particulates, potentially from washout activities or spills, are tracked throughout the Facility, and are tracked out via vehicles at the ingress/egress roadway.

131.    Plaintiffs are informed, believe, and thereon allege such trackout and discharges of spilled materials, mud, sediments, and/or comingled NSWD violate Discharge Prohibitions III.B of the Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    19

132. Plaintiffs are informed, believe, and thereon allege these same discharges of cloudy, opaque water from the Facility's northern boundary, and ultrafine particulates via the Facility's main driveway, indicate the Facility is discharging pollutants at levels which threaten organisms and ecosystems in violation of Discharge Prohibition III.C of IGP.

133. These observations demonstrate that the Facility lacks adequate BMPs to control and prevent such pollutants from discharging.

134. Plaintiffs are informed, believe, and thereon allege Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

135. Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

136. "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

137. Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

138. Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Hollister Facility's discharges or to the downstream Receiving Waters.

139. As such, Plaintiffs are informed, believe, and thereon allege the Defendant has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

140.   The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses."

141.   The Facility's cloudy discharges from its northern boundary, and the ultrafine sediment trackout along its ingress/egress driveway, strongly indicate the Facility has discharged high concentrations of TSS in excess of Basin Plan Water Quality Objective in violation of Discharge Prohibition III.D.

142.   Defendant has failed and continues to fail to collect and analyze any storm water samples from the Facility, despite the occurrence of such discharges. Defendant's failure to collect storm water samples in accordance with the IGP and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

143.   As such, in addition to TSS, which is visually apparent and a potential indicator of the presence of other pollutants, Plaintiffs are informed, believe, and thereon allege the Facility discharges other pollutants in concentrations exceeding Basin Plan Water Quality Objectives and the CTR, in violation of Discharge Prohibition III.D.

144.   Each time the Hollister Facility discharges polluted storm water or non-storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

145.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

146.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Discharge Prohibitions since March 10, 2017 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Exhibit 1 (setting forth dates of all precipitation events during the past five years).

/././

### 2. Discharges of Polluted Storm Water from the Hollister Facility Violate IGP Effluent Limitations.

147.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

148.   For example, the Facility's opaque discharges and the trackout of fine particulates observed on January 29, 2021 indicate high levels of TSS.

149.   While the MSGP includes a numeric Benchmark for TSS of 100 mg/L, Defendant has unjustifiably failed to collect any storm water samples which could be analyzed against this standard over the past five years. As such, the Facility's storm water monitoring data, or lack thereof, fails to reflect the full extent of the Facility's pollutant load contributions.

150.   The opaque discharges and trackout of fine particulates strongly indicate the Facility lacks adequate storm water BMPs to prevent such discharges.

151.   Part 2.1.2.5 of the MSPG "requires the use of structural and non-structural controls to minimize the discharge of sediment." MSGP Factsheet at 28.

152.   "Sediment control practices such as silt fences, sediment ponds, and stabilized entrances trap sediment after it has eroded. Sediment control practices, such as flow velocity dissipaters and sediment catchers, must be used to back up erosion control practices." *Id*.; *see also* EPA Industrial Stormwater Fact Sheet Series: Sector E. (last updated March 11, 2021).

153.   Visual observations of the Facility confirm that it lacks adequate BMPs. For example, there are no BMPs around the massive stockpiles of sediments, waste concrete, broken asphalt, and other materials.

154.   Visual observations confirm that Defendant has failed to implement any erosion control measures, silt fences, waddles, or any other type of structural or non-structural BMP to prevent or reduce polluted runoff from the stockpiles.

155.   Visual observations contradict the SWPPP's claims that all storm water runoff is directed to the retention pond and DP-1. The Facility discharges sediment-laden water from its northern boundary, and sediment and particulates are tracked out via the Facility's access road.

156.   As Defendant has failed to collect any samples from this Facility, in addition to TSS, which can be visually observed, Plaintiffs are informed, believe, and thereon allege the Facility discharges many other pollutants in concentrations exceeding EPA benchmarks, further indicating that the Facility has failed to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards.

157.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

158.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

159.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since March 10, 2017 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.   Discharges of Polluted Storm Water from the Hollister Facility Violate IGP Receiving Water Limitations.

160.   Plaintiffs are informed, believe, and thereon allege that the Hollister Facility has violated and continues to violate IGP Receiving Water Limitations.

161.   Plaintiffs are informed, believe, and thereon allege the Facility routinely discharges various sediments, particulates, aggregates, dirt, mud, and other various other solids in excess of applicable WQSs. For example, the Facility's cloudy, opaque discharges, and the trackout of fine particulates via the access road indicate the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality

Objectives.

162.  The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32.

163.  "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

164.  High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability. *Id*. at 3-32. Agricultural supply is a designated beneficial use of the lower segment of the Otay River.

165.  According to the 2020/2022 303(d) List, the Otay River is impaired for TDS.

166.  Plaintiffs are informed, believe, and thereon allege the Facility's polluted discharges cause and/or contribute to the Otay River's TDS impairment.

167.  As repeated noted, Defendant has failed and continues to fail to analyze storm water discharged from the Facility in violation of the Permit. As such, in addition to various settleable and dissolved solids, some of which can be visually observed, the Facility likely discharges many other pollutants in concentrations exceeding applicable Basin Plan water quality objectives and CTR criteria.

168.  The Basin Plan is an applicable WQSs under the IGP.

169.  Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

170.  Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility

are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

171. Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

172. Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

173. Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since March 10, 2017 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

174. Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

175. Plaintiffs are informed, believe, and thereon allege the Facility SWPPP and site map fail to accurately reflect on-the-ground site conditions.

176. The SWPPP and site map's claims that the entire Facility is one drainage area, that all storm water flows to the retention basin, and that the Facility only discharges from DP-1, are all patently erroneous.

177. Direct observations and photographs show that water ponds along the northern boundary of the Facility, and discharges through a berm to the north of the Facility. The SWPPP and site map fail to identify this discharge point at the northern boundary of the Facility.

178. Direct observations of the Facility layout, topography, and lack of BMPs, further indicate that the Facility likely discharges storm water from multiple other points around its perimeter.

179.   While the site map includes a few flow lines, it fails to identify storm water flow patterns for large swaths of the Facility.

180.   The site map's flow lines in the northern area of the Facility, which indicate that storm water flows south toward the retention basin, are directly contradicted by actual flow patterns of storm water ponding at the northern boundary, and discharging through the northern boundary's earthen berm.

181.   The site map fails to identify the location of the truck wash out area, where vehicle or equipment maintenance occurs, where material handling and processing occurs, and where any shipping and receiving activities occur.

182.   Plaintiffs are informed, believe, and thereon allege the aforementioned failures and inaccuracies are ongoing and continuous violations of the IGP. 2015 & 2020 Permits § X.E.3.

183.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continue to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

184.   The IGP requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." 2015 & 2020 Permits § X.G.2 (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

185.   Plaintiffs are informed, believe, and thereon allege the SWPPP's purported pollutant source assessment fails to comply with any of the aforementioned requirements.

186.   The SWPPP fails to assess any specific pollutants, or even categories of

pollutants, associated with the Facility's industrial activities and materials, much less information such as the pathways for exposure and degree of mobilization for such pollutants.

187. Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling of non-storm water with storm water, and the subsequent discharge of high concentrations of pollutants from the Facility, in violation of the IGP.

188. As discussed in Section V.B.2, *supra*, Coastkeeper's visual observations of the Facility's cloudy, opaque discharges from its northern boundary, and the extensive trackout of fine particulates via the Facility's access road, strongly indicate the Facility lacks adequate storm water BMPs.

189. Visual observations indicate the Facility lacks any BMPs around the massive stockpiles of sediments, waste concrete, broken asphalt, and other materials.

190. Visual observations indicate Defendant has failed to implement any erosion control measures, silt fences, waddles, or any other type of structural or non-structural BMP to prevent or reduce polluted runoff from the stockpiles.

191. The SWPPP's claim that all storm water runoff is directed to the retention pond and DP-1 is erroneous.

192. Thus, Plaintiffs are informed, believe, and thereon allege Defendant has failed to develop and implement a SWPPP with adequate BMPs as required by the IGP. *See* 2015 & 2020 Permits § X.H.

193. Plaintiffs are informed, believe, and thereon allege Defendant has also failed to revise the Facility's SWPPP to ensure compliance with the IGP. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. 2015 & 2020 Permits, § X.B.

194. As previously noted, the SWPPP is inaccurate and fails to align with actual site conditions, and thus, Defendant's failure to revise and update the SWPPP is a

violation of the IGP. *See* 2015 & 2020 Permits § X.B.

195. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

196. Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least March 10, 2017.

197. Plaintiffs are informed, believe, and thereon allege these violations are ongoing, Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since March 10, 2017.

**D.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Hollister Facility.**

198. Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

199. Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to collect the required number of storm water samples for each reporting period.

200. Defendant has failed to collect any storm water samples during the past five years.

201. The IGP requires Facilities enrolled in a compliance group to collect two samples each reporting period.

202. Numerous QSEs occurred during each reporting period. *See* Ex. 1.

203. Although the SWPPP states the Facility has a retention pond, it lacks any information regarding the capacity of the pond, stating only that the pond "does not have to meet the new design storm standards." This strongly indicates the Facility's retention basin does not, in fact, retain the volume from runoff produced from an 85th percentile 24-hour storm event.

204.   Even if the Facility could meet design storm standards, and complied with Alternative Compliance requirements of Attachment I of the IGP, which it does not, the IGP still requires the Facility to collect and analyze samples of its storm water discharges.

205.   The Facility's retention pond was designed to overflow, and the SWPPP indicates the Facility regularly discharges storm water. For example, the SWPPP states "[t]he retention pond settles sediment *before* discharge." 2021 SWPPP § G (emphasis added); *see also id*. at 40 (stating the retention pond "settles sediment *before* discharge occurs.").

206.   The Facility also discharges storm water through its norther boundary, and Defendant fails to collect samples from these discharges as well.

207.   Thus, Plaintiffs are informed, believe, and thereon allege the Facility regularly discharges storm water, and Defendant's failure to collect the required number of storm water samples during each reporting period violates the IGP.

208.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP.

209.   Plaintiffs are informed, believe, and thereon allege SIC code 5093 applies to the Facility because it is "primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[2]

210.   Information available to Plaintiffs indicate that the Facility engages in precisely these types of activities with waste concrete, asphalt, and other materials, and thus fits squarely within this SIC code.

211.   The IGP requires Facility's categorized under SIC code 5093 to analyze all

---

[2] NAICS Association, *Industry: 5093—Scrap and Waste Materials*, https://www.naics.com/sic-industry-description/?code=5093#:~:text=Establishments%20primarily%20engaged%20in%20assembling,in%20dismantling%20automobiles%20for%20scrap (last visited Mar. 22, 2021).

storm water samples for iron, lead, aluminum, zinc, and COD. 2015 & 2020 Permits, Table 1. The Facility has failed to sample for any of these parameters in violation of the IGP.

212.   Plaintiffs are informed, believe, and thereon allege Defendant has failed to sample for additional parameters that would indicate the presence of all industrial pollutants, pursuant to Section XI.B.6.c of the IGP.

213.   As noted in Section V.A, *supra*, information available to Plaintiffs indicates pollutants associated with the Facility's industrial activities and materials include TSS, pH, COD, lead, iron, zinc, BOD, aluminum, arsenic, cadmium, chromium, benzene, O&G, TDS, nitrogen, and phosphorus.

214.   Defendant has failed to analyze samples for any of these parameters in violation of the IGP.

215.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP. *See* 2015 & 2020 Permits § XI.B.4.

216.   Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled.

217.   There is no indication the Defendant has complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

218.   The Facility's own SWPPP and site map identify only one drainage area and one discharge point. However, on January 29, 2021 at approximately 11:30am, a Coastkeeper representative observed stormwater discharging through a berm along the Facility's northern boundary. The Facility was open and operating at the time of observation.

219.   The failure to identify this discharge point, and failure to collect samples from these discharges, are both violations of the IGP.

220.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs required by the IGP.

221.   Direct observations, the Facility's lack of BMPs and poor housekeeping, the SWPPP and site map's failure to align with on-the-ground conditions, and the Facility's failure to collect any storm water samples for the past five years, indicates Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

222.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

223.   Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least March 10, 2017.

224.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since March 10, 2017.

**E.   Defendant Has Violated the IGP's Reporting Requirements.**

225.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

226.   Plaintiffs are informed, believe, and thereon allege Defendant failed to submit an annual reports that comply with the Permit's reporting provisions.

227.   For example, the 2019–2020 Annual Report claims that the Facility did sample the required number of QSEs during that reporting period. However, the Facility has never collected storm water samples.

228.   The 2019–2020 Annual Report also fails to provide any explanation or justification for its failure to collect any storm water samples. Hence, this Annual Report

fails to comply with Permit's reporting requirements.

229.    In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

230.    The Facility's annual reports are certified attesting to the Facility's compliance with the terms of the IGP.

231.    Plaintiffs are informed, believe, and thereon allege these certifications are erroneous. As discussed throughout Section V.B–C of this Notice Letter, the Facility has violated, and continues to violate, numerous provisions of the IGP.

232.    Plaintiffs are informed, believe, and thereon allege the Facility's Legally Responsible Person knew or should have known the Facility had failed to comply with numerous procedural and substantive provisions of the IGP, and thus certifications of these annual reports were erroneous.

233.    Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

234.    Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least March 10, 2017.

235.    Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water

Act occurring since March 10, 2017.

## V.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

236.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

237.    Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge unauthorized non-storm water in violation of Section III.B of the IGP.

238.    Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

239.    Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

240.    Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from March 10, 2017 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

241.    Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 10, 2017 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

242. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

243. Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

244. Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

245. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

246. Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

247. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from March 10, 2017 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

248. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

249. Each day that Defendant operates the Facility without adequately developing

and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

250.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

251.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

252.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

253.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

254.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

255.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

256.   Plaintiffs are informed, believe, and thereon allege Defendant violated and

will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

257.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from March 10, 2017 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

258.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

259.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

260.   Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since March 10, 2017. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## **FOURTH CAUSE OF ACTION**

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### **33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

261.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

262.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the

Facility.

263.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

264.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

265.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from March 10, 2017, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

266.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

267.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION
### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

268.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

269.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

270. Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

271. Defendant has been in violation of the IGP MIP requirements every day from March 10, 2017, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

272. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

273. Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

274. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

275. Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

276. The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

277. Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least March 10, 2017. Defendant's violations of the reporting

requirements of the IGP and the CWA are ongoing and continuous.

278. Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

279. Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

280. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

281. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

282. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect and analyze the required number of storm water samples the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

283. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

284. Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020

Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

285.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since March 10, 2017. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

286.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

287.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 10, 2017. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VI.   **RELIEF REQUESTED**

288.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.   A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.   A court order assessing civil monetary penalties for each violation of the CWA at $59,973 per day per violation for violations that occurred after November 2,

2015 and assessed on or after January 12, 2022, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

e.      A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: May 11, 2022

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org