1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a California non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a California non-profit corporation,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>HANSON AGGREGATES PACIFIC SOUTHWEST LLC, a California limited liability company,<br><br>                    Defendant. | Civil Case No. 3:22-cv-667-BAS-WVG<br><br>**CONSENT DECREE**<br><br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

21
22
23
24
25
26
27
28

## CONSENT DECREE

The following Consent Decree ("Agreement") is entered into by and between San Diego Coastkeeper ("Coastkeeper"), Coastal Environmental Rights Foundation ("CERF") (collectively "Plaintiffs") and Defendant Hanson Aggregates Pacific Southwest LLC ("Hanson" or "Defendant"). The entities entering into this Agreement are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS**, Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California, with its main office in San Diego, California;

**WHEREAS**, Coastkeeper is dedicated to preservation, protection, and defense of the rivers, creeks, and coastal waters of San Diego County from all sources of pollution and degradation;

**WHEREAS,** CERF is a non-profit organization founded by surfers in North San Diego County and active throughout California's coastal communities;

**WHEREAS**, CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents, and one of CERF's primary areas of advocacy is water quality protection and enhancement;

**WHEREAS**, Hanson Aggregates Pacific Southwest LLC is the current owner and operator of a facility, located at 389 Hollister St., San Diego, California 92154, hereinafter referred to by the Settling Parties as the "Facility," where recycled aggregate and gravel products are stored and supplied for sale;

**WHEREAS**, Plaintiffs' members live and/or recreate in and around waters which Plaintiffs' members allege receive discharges from the Facility, including specifically the Otay River, San Diego Bay, and the Pacific Ocean;

**WHEREAS,** storm water and authorized non-storm water discharges from the Facility are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Industrial Storm Water Permit issued by the State of California

(NPDES General Permit No. CAS000001) [State Water Resources Control Board ("State Board")] Water Quality Order No. 2014-0057-DWQ, as amended by Order Nos 2015-0122-DWQ and 2018-0028-DWQ (hereinafter "Storm Water Permit"), and issued pursuant to Section 402(p) of the Federal Clean Water Act ("Clean Water Act" or "CWA" at 33 U.S.C. §§ 1251, *et seq.*), 33 U.S.C. § 1342(p)).

**WHEREAS**, on March 10, 2022, Plaintiffs sent Hanson, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the San Diego Regional Water Quality Control Board ("Regional Board") a notice of intent to file suit concerning the Facility ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b).  The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at the Facility;

**WHEREAS**, on May 12, 2022, Plaintiffs filed a complaint against Hanson in the United States District Court, Southern District of California ("Court") alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at the Facility ("Complaint");

**WHEREAS**, Hanson denies all allegations in the Notice Letter and Complaint relating to the Facility;

**WHEREAS**, Plaintiffs and Hanson have agreed that it is in the Settling Parties' mutual interest to enter into an Agreement setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint and the Notice Letter with respect to the Facility without further proceedings;

**WHEREAS**, all actions taken by Hanson pursuant to this Agreement shall be made in compliance with all applicable federal and state laws and local rules and regulations;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES:**

1.      The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a);

2.      Venue is appropriate in the Southern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility is located within this District;

3.      Plaintiffs have standing to bring this action; and

4.      The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the term of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree .

## I.      OBJECTIVES

5.      It is the express purpose of the Settling Parties entering into this Consent Decree to further the objectives set forth in the Clean Water Act and to resolve those issues alleged by Plaintiffs in their Complaint and Notice Letter.  In light of these objectives and as set forth fully below, Hanson agrees to comply with the provisions of this Consent Decree and to comply with the requirements of the Storm Water Permit and all applicable provisions of the Clean Water Act.

## II.     AGENCY REVIEW AND TERM OF CONSENT DECREE

6.      Plaintiffs shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively "Federal Agencies") within three (3) calendar days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which are to be provided to Hanson by Plaintiffs.  In the event that the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time.

7.      Within ten (10) calendar days of the Federal Agencies notifying the Settling

Parties of no objection to the Consent Decree or expiration of the Federal Agencies' review period specified in paragraph 6 above, whichever is earlier, Plaintiffs will lodge this Consent Decree with the District Court. If the Consent Decree is not entered by the District Court, the Settling Parties shall retain all rights they had in this litigation before the lodging of the Consent Decree.

8.   <u>Effective Date of Consent Decree.</u>  The term "Effective Date" as used herein shall mean the date the Court enters this Consent Decree as described in Paragraph 12 of this Consent Decree.

9.   <u>Termination Date of Consent Decree.</u> This Agreement will terminate on September 1, 2023, unless prior to the termination date either Settling Party has invoked the dispute resolution provisions of this Agreement and there is an ongoing, unresolved dispute regarding either Settling Party's compliance with this Agreement, in which case the Agreement will terminate upon final resolution of the dispute pursuant to the dispute resolution provisions contained herein.

**III.   COMMITMENTS OF THE SETTLING PARTIES.**

A.   **<u>Storm Water Pollution Control Best Management Practices.</u>**

10.   Hanson shall develop and ensure the ongoing maintenance and implementation of (as applicable) appropriate Best Management Practices ("BMPs") necessary to comply with the Permit, including but not limited to those that achieve the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Treatment Technology ("BCT"), and to comply with the Permit's Receiving Water Limitations.

11.   In addition to maintaining the current structural and non-structural BMPs described in the Facility's Storm Water Pollution Prevention Plans ("SWPPP") as of the Effective Date of this Agreement, Hanson shall implement the following additional BMPs at the Facility (and as depicted on **Exhibit A**) no later than November 30, 2022:

11.1.   Installation of additional perimeter berms and maintenance of current

berms along the north, west, south, and east sides of the Facility's boundaries as depicted on **Exhibit A** to ensure onsite stormwater retention;

11.2.   Installation of paving and a drive over berm in the northeastern portion of the Facility near the site entrance/exit as depicted on **Exhibit A**;

11.3.   Re-grading of the Facility to direct all on-site storm water in the northeastern portion of the Facility near the site entrance/exit as depicted on **Exhibit A**, to the existing storm water detention basin in drainage sub-catchment 1 (SC1).  Grading plans will be prepared by a licensed professional engineer;

11.4.   Installation of a designated overflow mechanism (i.e., riser pipe) within the existing storm water detention basin in SC1 in the southwest corner of the Facility as depicted on **Exhibit A** to convey excess storm water to Discharge Point 1.  The pipe connecting the riser with Discharge Point 1 will be installed underground across the access road and through the Facility's perimeter berm.  The existing storm water detention basin complies with the Volume-Based Design Storm Standards for Treatment Control BMPs set forth in Section X.H.6.a. of the Storm Water Permit;

Notwithstanding the foregoing, Hanson is not obligated to maintain any BMP that is rendered obsolete, including due to a subsequently installed BMP at the Facility.

**B.**   **Discharge Locations and Storm Water Sampling.**

12.   <u>Discharge Locations</u>. The current storm water discharge point(s) and sample location(s) are depicted in **Exhibit A**.  Should the future storm water sample locations change from what is presently depicted on the attached Exhibit, Hanson will provide Plaintiffs with an updated Exhibit, SWPPP, and Site Map.

13.     <u>Sampling</u>. Plaintiffs acknowledge the retention basin described in Paragraph 11.4 is intended to meet or exceed the Volume-Based Design Storm Standards for Treatment Control BMPs set forth in Section X.H.6.a. of the Storm Water Permit. However, Hanson must still collect samples from Discharge Point 1 should discharge occur as described herein, as required by the Storm Water Permit. The following storm water monitoring procedures shall be implemented at Facility:

13.1.     <u>Frequency</u>. During the term of this Consent Decree, and so long as Hanson is a Compliance Group Participant[1] at each Facility, Hanson shall collect samples of storm water discharges at all discharge locations at the Facility from a minimum of two (2) "qualified storm events ("QSEs")[2]" that occur in a Reporting Year such that Hanson collects one (1) sample during the first half of the Reporting Year (July 1 through December 31) and one (1) sample during the second half of the reporting year (January 1 through June 30) at the Facility, provided that one (1) QSE occurs at the Facility during each half of the Reporting Year.  If, prior to March 1, Hanson has collected samples from less than two (2) QSEs at the Facility, Hanson shall collect samples during as many QSEs at the Facility as necessary until a minimum of 2 storm events have been sampled for the Reporting Year, provided that 2 QSEs occur during a Reporting Year.  For purposes of this Agreement, "Reporting Year" means July 1 to June 30.  If it no longer participates in a Compliance Group for a Facility, Hanson shall collect samples of storm water discharges at all discharge locations at the Facility from two (2) "qualified storm events" ("QSEs")[3] that occur during the first half of the Reporting Year (July 1 through December

---

[1] As defined in the Storm Water Permit.
[2] As defined in the Storm Water Permit.
[3] As defined in the Storm Water Permit.

31) and two (2) samples during the second half of the reporting year (January 1 through June 30) at the Facility, provided that two (2) QSEs actually occur at the Facility during each half of the Reporting Year.

13.2.   <u>Contained or Stored Storm Water</u>. To the extent water is stored or contained at the Facility, Hanson shall sample the stored or contained water upon being discharged or released via Discharge Point 1.

13.3.   <u>Parameters</u>. Hanson shall analyze each storm water sample collected from the Facility for the total suspended solids, oil & grease, pH, iron, and zinc.

13.4.   <u>Laboratory</u>. A laboratory accredited by the State of California shall analyze all samples collected pursuant to this Agreement, except for those constituents analyzed by field measurements, such as pH.

13.5.   <u>Detection Limits</u>. The laboratory shall use analytical methods adequate to detect the individual constituents at or below the levels listed in Table 1.

13.6.   <u>Hold Time</u>. All samples collected from the Facility shall be delivered to the laboratory as necessary to ensure that sample "hold time" is not exceeded for each constituent sampled.

13.7.   <u>Reporting</u>.  Sample results will be available to Plaintiffs in the Storm Water Multiple Application Reporting System ("SMARTS") for the Facility.  Hanson shall provide Plaintiffs notice when sample results are uploaded to SMARTS, and provide Plaintiffs with the complete laboratory results, including a copy of the Quality Assurance/Quality Control and the laboratory report for all samples collected at the Facility pursuant to this Agreement, upon request.

**C.   <u>Visual Observations.</u>**

14.   During the term of this Agreement, Hanson shall conduct and document

visual observations in accordance with the terms of the Storm Water Permit and this Agreement, and as described in the Facility's SWPPP.

15.    Hanson shall make these records available for Plaintiffs' review via email within seven (7) calendar days of the request.

**D.    Employee Training.**

16.    Within forty-five (45) calendar days of the Effective Date, if not previously performed within ninety (90) days of the Effective Date, Hanson shall conduct additional employee training in order to familiarize employees at the Facility with the requirements of the Storm Water Permit and this Consent Decree ("Training Program"). The Training Program shall include use of written training materials needed for effective implementation. Hanson shall also ensure that there are a sufficient number of employees assigned to implement the BMPs and conduct other compliance activities required by the Storm Water Permit and this Consent Decree, and that these employees are properly trained to perform the required activities.

17.    The training program shall require at least the following:

17.1.    <u>Non-Storm Water Discharge Training</u>. Hanson shall train employees on the Storm Water Permit's prohibition of non-storm water discharges, so that employees know what non-storm water discharges are, which can result from improper practices that may produce non-storm water discharges at the Facility, and how to detect and prevent them;

17.2.    <u>BMP Training</u>. Hanson shall train employees on BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent or minimize the exposure of pollutants to storm water, to prevent or minimize the discharge of contaminated storm water, and to ensure the proper treatment of storm water at the Facility;

17.3.    <u>Sampling Training</u>. Hanson shall designate an adequate number of employees or consultants to ensure the collection of storm water samples from each discharge location as required by this Agreement and/or the Storm Water Permit. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory.

17.4.    <u>Visual Observation Training</u>. Hanson shall provide training to all individuals performing visual observations at the Facility pursuant to this Agreement and/or the Storm Water Permit that includes when visual observations are required, the different types of visual observations required, and instruction on proper record keeping under the Storm Water Permit.

18.    <u>Ongoing Training.</u> Training shall be repeated as necessary to ensure that employees are familiar with the requirements of this Consent Decree, the Storm Water Permit, and the Facility's SWPPP as appropriate to the particular employee's job descriptions. Any new employee who is responsible for implementation of any portion of the SWPPP,  or compliance with other terms of the Storm Water Permit or Consent Decree shall receive training within thirty (30) business days after being hired, or before being responsible for compliance with the terms of the Storm Water Permit or Agreement.

19.    <u>Training Records.</u>  Hanson shall maintain training records to document compliance with Article III.D of this Agreement including, but not limited to, all written or visual training materials, the dates of each training, attendance for each training, and summaries of topics covered. Hanson shall make these records available for Plaintiffs' review upon request. The Training Program shall be specified in the SWPPP and Hanson shall modify the SWPPP as necessary to reflect the training program required by this

1  Agreement.

2  **E.   Storm Water Pollution Prevention Plan and Monitoring and Reporting**

3  **Plan.**

4      20.   Within ninety (90) calendar days of the Effective Date of this Agreement,

5  Hanson shall revise the Facility's SWPPP and/or Site Map as applicable to include:

6      20.1.   Revising the Facility's Standard Industrial Classification ("SIC")

7              code to 5032 (Brick, Stone, and Related Construction Materials);

8      20.2.   All BMPs prescribed in Section 11 of this Consent Decree;

9      20.3.   Accurate delineations of all drainage areas, flow patterns, and

10             Discharge Points;

11     20.4.   All other BMPs that are currently utilized at the Facility or identified

12             and developed pursuant to this Consent Decree and/or the Storm

13             Water Permit;

14     20.5.   The specific individual(s) or positions responsible for compliance

15             with the Storm Water Permit and this Agreement;

16     20.6.   A detailed site map that includes at a minimum all information

17             required by the Storm Water Permit and this Agreement; and

18     20.7.   A description of each industrial activity, all potential pollutant

19             sources, and each potential pollutant associated with each industrial

20             activity and/or pollutant source.

21     21.   Additional and Ongoing Revisions to SWPPP and/or Site Map. Hanson shall

22  revise the SWPPP and/or M&RP if there are any changes with the Facility's operations

23  that may possibly affect the quality of storm water discharges at that Facility, including

24  but not limited to changes to storm water discharge point(s)/sample location(s) or

25  changes or additions to the BMPs at the Facility resulting from an Action Plan.

26     22.   Commenting on Revised SWPPP and/or Site Map. Hanson shall submit any

27  revised SWPPP to Plaintiffs within five (5) business days of completion.

28

1837550v1  Consent Decree            11            Civil Case No. 3:22-cv-667-BAS-WVG

22.1.  For any SWPPP or Site Map revisions that would substantially alter operations or the pollutants generated by or at the Facility, Plaintiffs shall provide comments, if any, to Hanson within thirty (30) calendar days of receipt of any revised SWPPP and/or Site Map. Within thirty (30) calendar days of receiving comments from Plaintiffs, Hanson shall incorporate Plaintiffs' comments into any revised SWPPP and/or Site Map or shall justify in writing why any comment is not incorporated. Any disputes as to the adequacy of the SWPPP and/or Site Map shall be resolved pursuant to the dispute resolution provisions of this Agreement, set out in Article VI below.

23.  Except in a case of force majeure, as described in paragraph 35, Hanson shall contact Plaintiffs to request an extension of any deadline set forth in this Agreement, if necessary, at least fourteen (14) calendar days prior to the deadline at issue. Plaintiffs' consent to Hanson's requested extension shall not be unreasonably withheld.

## IV.    COMPLIANCE MONITORING AND REPORTING

24.  <u>Site Inspections</u>. Plaintiffs and their representatives may conduct one noticed site inspection at the Facility during the effective term of this Consent Decree. The site inspections shall occur during normal business hours, and Plaintiffs shall provide Hanson with at least five (5) business days' notice of an intended inspection, except that Hanson will have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with operations or the schedule of any party and/or attorney, or the safety of individuals.  In such case, Hanson will specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by Plaintiffs may proceed.  If a Wet Season inspection is noticed, Plaintiffs will continue to follow the weather forecast, and will confirm the Wet Season inspection at least twenty-four (24) hours prior to the start of the inspection in an effort to ensure Plaintiffs'

inspection captures a rain event producing a storm water discharge.  Lack of a rain event does not prevent Plaintiffs from conducting the noticed inspection.  During inspections, Plaintiffs' representatives will wear all appropriate personal protective equipment (PPE) and remain in the presence of Hanson's representatives at all times. Plaintiffs' inspection team shall consist of no more than three (3) persons.

25.     During the site inspection, Plaintiffs and/or their representatives shall be allowed access to the Facility's SWPPP, Site Map, and other monitoring records, reports, and all sampling data for the Facility. In addition, during the site inspection, Plaintiffs and/or their representatives may collect grab samples of discharges from the Facility. Plaintiffs shall orally list the constituents that Plaintiffs intend to analyze at the commencement of the site inspection.  Plaintiffs shall provide Hanson with properly preserved split samples, shall allow Hanson to photograph and/or videotape the sample collection process, and shall provide Hanson with a designation of who will perform any discharge sampling.  Any samples collected by Plaintiffs shall be collected in accordance with Attachment H of the Storm Water Permit and submitted to a certified California laboratory for analysis. Any onsite measurements such as pH shall be taken by a properly trained operator with properly calibrated instruments.  Hanson shall have an opportunity to take concurrent measurements using its own equipment.  Copies of the complete laboratory reports shall be provided to Hanson within five (5) business days of Plaintiffs' receipt.  Plaintiffs shall bear all costs of inspection, sampling, and analysis.

26.     Access to the Facility.  Plaintiffs acknowledge that inspection and/or sampling of the Facility is potentially hazardous and involves certain risks, including the risks of serious bodily injury, death, and property damage, and Plaintiffs accept and assume all risk of harm to persons and property from Plaintiffs' entry upon the Facility. To the fullest extent permitted by law, Plaintiffs shall also defend (with legal counsel reasonably acceptable to Hanson ), indemnify, protect, and hold harmless Hanson and its affiliates and their respective officers, directors, members, partners, agents, officers,

employees, and representatives ("Indemnified Parties"), from and against any and all claims, losses, costs, damages, injuries (including, without limitation, injury to or death to Plaintiffs' officers, employees, agents, and contractors), expense, and liability of every kind, nature, and description (including, without limitation, incidental and consequential damages, court costs, and litigation expenses and fees of expert consultants or expert witnesses incurred in connection therewith and costs of investigation) that arise out of, pertain to, or relate to, directly or indirectly, in whole or in part, any bodily injury, death, or property damage arising out of, connected with or related to Plaintiffs' presence at, inspection of, and/or sampling at the Facility.  Plaintiffs' duty to defend, indemnify, protect and hold harmless shall not include any claims or liabilities arising from the sole negligence or willful misconduct of the Indemnified Parties.  This Paragraph shall survive termination or expiration of this Consent Decree.

27.     <u>Reporting and Documents</u>. During the term of this Consent Decree, Hanson shall copy Plaintiffs on all documents related to the Storm Water Permit at the Facility that are submitted to the Regional Board, the State Board, and/or any State or local agency or municipality. Such reports and documents shall be provided to Plaintiffs concurrently as they are sent to the agencies and/or municipalities. Any correspondence related to Hanson's compliance with the Storm Water Permit or storm water quality received by Hanson from any regulatory agency, State or local agency, county or municipality shall be provided to Plaintiffs within ten (10) business days of receipt by Hanson.

28.     <u>Compliance Monitoring and Oversight</u>.  Hanson shall compensate Plaintiffs for reasonable costs and fees incurred for monitoring Hanson's compliance with this Agreement.  Plaintiffs shall prepare a joint invoice for submittal to Hanson.  The invoice shall include a description of the monitoring activity, the time spent, and the rate charged for each person that performs monitoring activities. Subject to the Dispute Resolution provision in Article VI, below, Hanson shall compensate Plaintiffs for costs and fees

incurred for monitoring meeting(s) attendance, review of Hanson's-related documents and monitoring reports and Action Plans, submission of Plaintiffs' comments, meetings held to discuss compliance deadlines, site inspections, and attendance at additional mutually agreed upon meetings between the Settling Parties. Review of Storm Water Permit information or publicly distributed information from the State Board or Regional Board shall not be recoverable by Plaintiffs or included in the invoice. Payment shall be made within forty-five (45) calendar days of the later of: (a) Hanson's receipt of an invoice from Plaintiffs for such compliance efforts, or (b) final resolution of any dispute concerning the invoice pursuant to the Dispute Resolution provision in Article VI, below. Such payment shall be  payable to Coastal Environmental Rights Foundation via certified U.S. Mail or commonly accepted carrier to 1140 South Coast Highway 101 Encinitas, California 92024. Invoices shall be submitted by Plaintiffs no more frequently than on a calendar quarterly basis.  Total monitoring fees for the Facility shall be capped at $4,000 for the term of the Agreement.

## V.      __Environmental Project, Reimbursement of Litigation Fees and Costs, and Stipulated Payments__

29.     __Environmental Project__. To remediate the alleged environmental harms resulting from non-compliance with the Storm Water Permit alleged in the Complaint, Hanson agrees to make a payment totaling twelve thousand dollars ($12,000) to fund environmental project activities. Payment shall be made as follows: a payment Lakeside River Park Conservancy via certified U.S. Mail to 12108 Industry Road, Lakeside, California 92040 within thirty (30) calendar days of the Effective Date.

30.     __Reimbursement of San Diego Coastkeeper and Coast Law Group's Fees and Costs__. Hanson shall pay a total of thirty thousand dollars ($30,000) to Coast Law Group, LLP and San Diego Coastkeeper to reimburse investigation fees and costs, expert/consultant fees and costs, and reasonable attorneys' fees incurred as a result of investigating and preparing the lawsuit and negotiating this Agreement. Payments shall

be made within thirty (30) calendar days of the Effective Date and payable to: Coast Law Group, LLP, Attn: Livia Borak Beaudin via certified U.S. Mail or commonly accepted carrier to 1140 South Coast Highway 101 Encinitas, California 92024.

## VI.   DISPUTE RESOLUTION

31.   This Court shall retain jurisdiction over this matter until the Termination Date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree.  The Court shall have the power to enforce this Agreement with all available legal and equitable remedies, including contempt.

32.   Meet and Confer. A party to this Consent Decree shall invoke the dispute resolution procedures of this Section by notifying all other Settling Parties in writing of the matter(s) in dispute. The Settling Parties shall then meet and confer in good faith (either telephonically or in person) in an attempt to resolve the dispute informally over a period of ten (10) business days from the date of the notice. The Settling Parties may elect to extend this time in an effort to resolve the dispute without court intervention.

33.   If the Settling Parties cannot resolve a dispute by the end of meet and confer informal negotiations, the Settling Parties may agree to enter into the Alternative Dispute Resolution process provided by the United States District Court for the Southern District of California, including, but not limited to, stipulating to a hearing or settlement conference before a Magistrate Judge.  If the Settling Parties cannot resolve a dispute via the Alternative Dispute Resolution process, the party initiating the dispute resolution provision may invoke formal dispute resolution by filing a motion for a ruling on the dispute by the United States District Court for the Southern District of California.

34.   Costs and Fees.  Litigation costs and fees incurred in conducting the meet and confer or otherwise addressing and/or resolving any dispute, including an alleged

breach of this Agreement, shall be awarded in accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. §§1365 and 1319, and case law interpreting that standard.

35.     <u>Force Majeure.</u>  No Settling Party shall be considered to be in default in the performance of any of its obligations under this Agreement when performance becomes impossible or delayed due to circumstances beyond the Settling Party's control, including Force Majeure.  "Force majeure" means, without limitation, any act of god, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or public authority or agency; inability to proceed due to pending litigation under the California Environmental Quality Act; action or non-action by, or inability obtain the necessary authorizations, approvals, or permits from, any governmental agency; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available, though the cost of such material or equipment is not a factor in whether it is reasonably available. Impossibility and/or Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay.  Any party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and which by exercise of due diligence has been unable to overcome the failure or performance.  Delay in compliance with a specific obligation under this Agreement due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Agreement.

a.     If Defendant claims compliance was or is impossible or delayed due to Force Majeure, it shall notify Plaintiffs in writing as soon as possible, but in no event more than five (5) business days of the date that Defendant learns of the event or circumstance that caused or would cause a violation of this Agreement (hereinafter referred to as the "Notice of Nonperformance").

b.      Within ten (10) business days of sending the Notice of Nonperformance, Defendant shall send Plaintiffs a detailed description of the reason for the nonperformance and the specific obligations under the Agreement that are or have been affected by the Force Majeure. It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by Defendant to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. Defendant shall adopt all reasonable measures to avoid and minimize such delays.

c.      The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Agreement, despite the timely good faith efforts of Defendant, new deadlines shall be established.

d.      If Plaintiffs disagree with Defendant's Notice of Nonperformance, or in the event that the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either party shall have the right to invoke the dispute resolution procedure pursuant to Article VI. In such proceeding, Defendant shall bear the burden of proving that any delay in performance of any requirement of this Agreement was caused or will be caused by impossibility and/or Force Majeure and the extent of any delay attributable to such circumstances.

## VII.     MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

36.      Plaintiffs' Release. Except for alleged violation and/or enforcement of this Consent Decree, which shall be addressed in accordance with the Dispute Resolution provisions in Article VI, upon the Effective Date of this Consent Decree, CERF and Coastkeeper, on their own behalf and on behalf of their respective current and former officers, directors, employees, each of their successors and assigns, and their agents, attorneys, and other representatives and all persons, firms, and corporations having an interest in them, release all persons including, without limitation, Hanson and each of

its direct and indirect parent and subsidiary companies and affiliates, and their respective current and former officers, directors, members, partners, employees, shareholders, and each of their predecessors, successors, and assigns, and each of their agents, attorneys, consultants, and other representatives (collectively, "Hanson Releasees") from and waive any and all claims and liabilities, relief, damages, fees (including fees of attorneys, experts, and others), injuries, actions, or causes of action, either at law or in equity, whether known or unknown, against Hanson Releasees arising from or related to the Notice Letters and/or Complaint, and any violations of the Clean Water Act, the Storm Water Permit, or other federal, state, and local law concerning the Facility, up to and including the Termination Date of this Consent Decree.

37.     <u>Hanson's Release</u>. Except for violation and/or enforcement or defense of actions taken pursuant to this Consent Agreement, which shall be addressed in accordance with the Dispute Resolution provisions in Article VI, upon the Effective Date of this Consent Decree, Hanson, on its own behalf and on behalf of its current and former officers, directors, employees, members, and each of their successors and assigns, and their agents, attorneys, and other representatives releases Plaintiffs (and their current and former officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representatives) from and waives all claims that Hanson has against Plaintiffs arising from the Notice Letters and/or Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses, or any other sum incurred or claimed for matters related to Plaintiffs' Notice Letters and Complaint, up to the Termination Date of this Consent Decree.

38.     Plaintiffs and Hanson acknowledge that they are familiar with Section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

Plaintiffs and Hanson hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to the releases stated in Paragraphs 36 and 37 above.

39.     Except as provided for in the Dispute Resolution provisions of this Agreement at Article VI, Plaintiffs' and their officers, executive staff, members of their governing boards and any organization under the control of Plaintiffs, their officers, executive staff, or members of its governing board, shall not pursue or file any action against Hanson seeking relief for any alleged violation of the Clean Water Act, the Storm Water Permit or any revisions thereto, or other related federal, state, and local statutes, regulations, and/or ordinances, relating to the Facility, that may be alleged for the period of time up to and including the Termination Date.  This provision is applicable and will survive beyond the Termination Date of this Consent Decree.

40.     Nothing in this Consent Decree limits or otherwise affects any Party's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the State Board, Regional Board, EPA, or any other administrative body on any other matter relating to Hanson's compliance with the Storm Water Permit or the Clean Water Act occurring or arising after the Effective Date of this Consent Decree.

## VIII.   MISCELLANEOUS PROVISIONS

41.     No Admission of Liability. Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Hanson maintains and reserves all defenses

they may have to any alleged violations that may be raised in the future.

42.     Missed Deadlines. Hanson shall make a stipulated payment of $1,000.00 for all missed deadlines under Paragraphs 22 and 28-30 unless Hanson has invoked the dispute resolution procedure for the missed deadline.  Payment shall be made within forty-five (45) calendar days of a missed reporting deadline and payable to the Lakeside River Park Conservancy and sent to the Lakeside River Park Conservancy, 12108 Industry Road, Lakeside, California 92040 via U.S. Mail or similar delivery service.  Hanson shall have 30 calendar days to cure any missed deadlines once notified, or in the alternative, invoke the dispute resolution procedures set forth below.

43.     Construction. The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Storm Water Permit, the Clean Water Act, or specifically herein.

44.     Choice of Law. The laws of the United States shall govern this Consent Decree .

45.     Severability. In the event that any provision, paragraph, section, or sentence of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

46.     Correspondence. Unless specifically provided for in this Consent Decree , all notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by U.S. mail or electronic mail as follows:

If to Plaintiff CERF:

Coastal Environmental Rights Foundation
Attn: Sara Ochoa
1140 South Coast Highway 101
Encinitas, California 92024
Email: sara@cerf.org


With a copy to

Marco Gonzalez

Livia Borak Beaudin
Coast Law Group, LLP
1140 South Coast Highway 101
Encinitas, California 92024
Email: livia@coastlaw.com

If to Plaintiff Coastkeeper:
San Diego Coastkeeper
Attn: Patrick McDonough
3900 Cleveland Ave., Suite 102
San Diego, CA 92103
Email: patrick@sdcoastkeeper.org

If to Hanson:

Hanson Aggregates Pacific Southwest LLC
Attn: Environmental Manager
4211 Ponderosa Avenue #C
San Diego, CA 92123

With a copy to:

Hanson Aggregates Pacific Southwest LLC.
Attn: Erika Guerra, Director, Environmental & Land Resources
3000 Executive Pkwy
San Ramon, CA 94583
Email: Erika.Guerra@martinmarietta.com

Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Email: ngranquist@downeybrand.com

47.    Notifications of communications shall be deemed submitted three (3) business days after having been sent via U.S. mail or the day of sending notification or communication by electronic mail. Any change of address or addresses shall be communicated in the manner described above for giving notices.

48.   <u>Effect of Agreement</u>. Except as provided herein, Plaintiffs do not, by their consent to this Agreement, warrant or aver in any manner that Hanson's compliance with this Agreement will constitute or result in compliance with any federal or state law or regulation. Nothing in this Agreement shall be construed to affect or limit in any way the obligation of Hanson to comply with all federal, state, and local laws and regulations governing any activity required by this Agreement.

49.   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature, and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Agreement.

50.   <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties. If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

51.   <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this matter.

52.   <u>Integration Clause</u>. This is an integrated agreement. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Agreement.

53.   <u>Authority</u>. The undersigned representatives for Plaintiffs and Hanson each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this Consent Decree.

54.   The Settling Parties certify that their undersigned representatives are fully

authorized to enter into this Consent Decree, to execute it on behalf of the Settling Parties, and to legally bind the Settling Parties to its terms.

55.    The Settling Parties, including any successors or assigns, agree to be bound by this Consent and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first set forth below.

APPROVED AS TO CONTENT

Dated:    11/22/2022                    By: _____
                                        Sara Ochoa
                                        Coastal Environmental Rights Foundation

Dated:    11/28/2022                    By: _____
                                        Phillip Musegaas
                                        San Diego Coastkeeper

Dated: _____                By: _____
                                        Roselyn R. Bar
                                        Hanson Aggregates Pacific Southwest LLC

APPROVED AS TO FORM

Dated:    11/22/2022                    By: _____
                                        Marco Gonzalez
                                        Livia Borak Beaudin
                                        Coast Law Group, LLP
                                        Attorneys for Coastal Environmental Rights
                                        Foundation

1837550v1 Consent Decree          24          Civil Case No. 3:22-cv-667-BAS-WVG

1   authorized to enter into this Consent Decree, to execute it on behalf of the Settling

2   Parties, and to legally bind the Settling Parties to its terms.

3       55.     The Settling Parties, including any successors or assigns, agree to be

4   bound by this Consent and not to contest its validity in any subsequent proceeding to

5   implement or enforce its terms.

6       **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as

7   of the date first set forth below.

8   APPROVED AS TO CONTENT

9

10  Dated: _____      By: _____

11                                     Sara Ochoa
                                       Coastal Environmental Rights Foundation
12

13  Dated: _____      By: _____

14                                     Phillip Musegaas
                                       San Diego Coastkeeper
15

16

17  Dated:   11/22/22                   By: _Roselyn R. Bar_

18                                     Roselyn R. Bar
                                       Hanson Aggregates Pacific Southwest LLC
19

20  APPROVED AS TO FORM

21

22  Dated: _____      By: _____

23                                     Marco Gonzalez
                                       Livia Borak Beaudin
24                                     Coast Law Group, LLP
                                       Attorneys for Coastal Environmental Rights
25                                     Foundation
26

27

28

1837550v1 Consent Decree              24          Civil Case No. 3:22-cv-667-BAS-WVG

Dated: _____11/28/22_____

By: _____

Patrick McDonough
Attorney for San Diego Coastkeeper


Dated: _November 28, 2022_

By: _____

Nicole Granquist
Downey Brand LLP
Attorneys for Hanson Aggregates Pacific
Southwest LLC

**IT IS SO ORDERED.**

**FINAL JUDGMENT**


Date: _February 27, 2023_

Honorable Cynthia Bashant
United States District Court Judge
Southern District of California

# EXHIBIT A



## LEGEND

**SC#** — DRAINAGE SUB-CATCHMENT

— SURFACE FLOW DIRECTION (APPROX.)

— DRAINAGE SUB-CATCHMENT BOUNDARY

— FACILITY BOUNDARY (APPROX.)

— STORM WATER PONDING/CONTAINMENT

— BERM FOOTPRINT (TYP.)

— IMPERVIOUS AREA

1 — DISCHARGE POINT

— STORAGE AREA

(P) — PROPOSED IMPROVEMENT

30 — EXISTING TOPOGRAPHY

—30— — PROPOSED GRADING CONTOURS (TYP.)

## NOTES

1. THE DELINEATED DRAINAGE SUB-CATCHMENTS ASSUME THAT ALL IMPROVEMENTS SHOWN HEREON ARE IN PLACE, AND THAT ALL BERMS ARE OF AMPLE HEIGHT AND CONSTRUCTION TO RETAIN STORM WATER.

2. SUB-CATCHMENTS SC1 HAS STORM WATER CONTAINMENT BEST MANAGEMENT PRACTICES (BMPs). THE DISCHARGE POINT SHOWN IS THE EXPECTED LOCATION OF STORM WATER DISCHARGE IN THE EVENT THAT THE EXISTING CONTAINMENT IS OVERWHELMED.

3. DRAINAGE SUB-CATCHMENT SC2 IS COMPLETELY SURROUNDED BY BERMS AND DOES NOT APPEAR TO CONTAIN ANY INDUSTRIAL ACTIVITY. FOR THE PURPOSE OF THIS ANALYSIS, IT IS ASSUMED THAT SUB-CATCHMENT SC2 IS SELF CONTAINED.

4. DRAINAGE FLOW ARROWS SHOWN ARE APPROXIMATE.

## RUNOFF ANALYSIS

THE INFORMATION IN THE TABLE BELOW REPRESENTS THE ANTICIPATED RUNOFF FROM THE CALIFORNIA STORM WATER INDUSTRIAL GENERAL PERMIT (IGP) DESIGN STORM STANDARD (85TH PERCENTILE, 24-HOUR STORM EVENT).

| Description | Quantity | Unit |
|---|---|---|
| **Design Storm** | | |
| 85% 24-hr Rainfall Depth (P) | 0.54 | in. |
| **Drainage Sub-catchment 1 (SC1)** | | |
| Design Storm Runoff Volume | 20,610 | gal. |
| Design Storm Runoff Volume (w/ 10% Factor of Safety) | 22,671 | gal. |
| Existing On-site Storage Capacity | 111,439 | gal. |

Map labels: SC2, SC1, PERIMETER BERM WITH (P) IMPROVEMENTS, (P) K-RAILS, ENTRANCE/EXIT, (P) ELEVATED, PAVED ENTRANCE DRIVEWAY, RUMBLE STRIPS, OFFICE, BERM, TRUCK STORAGE, (P) CONTAINMENT BERM, WATER TANK, (P) RISER & CONVEYANCE PIPE, (P) PROCESS WATER CONTAINMENT, PROCESSING PLANT, STORAGE CONTAINER, STORM WATER BASINS WITH (P) IMPROVEMENTS, PERIMETER BERM WITH (P) IMPROVEMENTS, STORM WATER CHANNEL WITH (P) IMPROVEMENTS

200  0  200  400
SCALE IN FEET

DISCLAIMER: DRAINAGE AREAS ARE APPROXIMATE AND HAVE BEEN DELINEATED BASED ON VISUAL FIELD OBSERVATIONS AND TOPOGRAPHIC DATA PROVIDED BY MARTIN MARIETTA STAFF.

DATUM:  HORZ= NAD83, CALIFORNIA ZONE 2, US FOOT
AERIAL:  GOOGLE EARTH, DATE 07/2021

C:\Users\Pearce.Swerdfeger\Trinity Consultants, Inc\Martin Marietta Materials – Documents\CA Hollister Street\Projects\220509.0134 SW Support\07 CAD\ACAD_Hollister-Drainage Proposed v3.0.dwg  Nov 15, 2022, 1:24pm  Pearce.Swerdfeger

**SESPE CONSULTING, INC.**
*A Trinity Consultants Company*
374 Poli Street, Suite 200 • Ventura, CA 93001
(805) 275-1515 • www.sespeconsulting.com

SITE DRAINAGE PLAN
HOLLISTER FACILITY
389 HOLLISTER STREET
SAN DIEGO, CA 92154

FIGURE NUMBER
1

DATE: NOVEMBER 2022